No. 14,105.

GEORGE BUDGE vs. MORGAN'S LOUISIANA AND TEXAS RAILROAD AND STEAMSHIP COMPANY.

SYLLABUS.

1. Masters are not insurers. They are liable to their servants for the consequences, not of danger but, of negligence, and negligence, in cases where the servant is injured by reason of defective appliances, consists of the

Budge vs. Railroad and Steamship Company.

failure of the master to exercise due care that the appliances furnished for the use of his servants shall be safe when furnished and shall be maintained in a safe condition.

2. Whatever may be the duty of the master as to the methods to be adopted for ascertaining, originally, whether the appliances so furnished are suitable and safe, due care requires him, especially in the use of dangerous appliances, or where the service in which they are used is dangerous, either by himself, or by some other, selected for the purpose, in either case, one competent and qualified, to inspect, and look after the condition of, such appliances, and see that they are kept in repair.

3. This duty is personal to the master, and must be continuously performed by him, or by those whom he selects to represent him, and he is liable for its neglect, whether by his representatives or by himself, the danger resulting therefrom not being assumed by his servants as incidental to their employment.

4. A railroad company drawing the cars of another company over its road owes a duty to its employees in reference thereto. It is bound to inspect such cars, the same as its own, and is responsible for the consequences of such defects as would have been disclosed by ordinary inspection, as it is its duty either to remedy them or to refuse to take the cars. The employee no more assumes the risks of such defects than of those in the cars belonging to his employer.

5. Men without scientific knowledge and without practical experience in the handling of moving cars and trains, who may be employed as car inspectors and charged with the duty of seeing that the parts and appliances of the cars are safe and sound and in their proper positions do not thereby become qualified as experts in the matter of the causes which may operate to derail a car or to prevent its trucks from working properly.

6. It is a fair presumption that railroad companies have no desire to subject their employees to unnecessary risks, or, upon the other hand, to waste money by encumbering their cars with useless contrivances, but that they endeavor to obtain cars, which, being the safest and most serviceable, cost the least money. When, therefore, an inspector, such as those above referred to, undertakes to decide that an appurtenance for which scientific knowledge has provided a particular place will discharge its function as well somewhere else, or that it may be dispensed with, he places himself in antagonism to the position to which his employer, with greater knowledge and greater interest, is already committed.

7. The opinions of car inspectors, not experts in the running of cars, do not prove that it is as safe to operate a freight car with a hanger pin out of its sockets and a nut missing from a bolt which holds a friction plate in position as if those parts were properly adjusted, and, as a matter of fact, it is not as safe, and it is negligence to tolerate a system of inspection which proceeds upon the contrary theory.

8 Verdict and judgment for $12,500, for the loss of a leg, amended by reducing the amount to $6,000.

APPEAL from the Twenty-third Judicial District, Parish of St. Mary, *Allen, J.*

*Foster, Milling, Godchaux & Sanders,* for Plaintiff, Appellee.

*D. Caffery & Son* for Defendant, Appellant.

The opinion of the court was delivered by MONROE, J.

An application for rehearing by MONROE, J.

The opinion of the court was delivered by

MONROE, J. Plaintiff sues for damages for personal injuries sustained whilst in the discharge of his duties as brakeman in defendant's employ at Morgan City. The petition alleges that, after he had coupled certain cars to an engine, the train moved and petitioner, as was his duty, climbed upon the ladder of the first box car that approached him for the purpose of riding to the next switch, "and when his hand had almost reached the topmost round of the ladder, the said car jumped off the track, came near turning over on your petitioner, threw him from the ladder to the plank flooring on the track, and caught his right leg in such a way as to crush the ankle and leg below the knee; that the injury was occasioned by a defect in that part of the machinery which allows the body of the car to work upon the axles of the trucks so as to allow the trucks to turn in order that they will take a curve in the track, and, as this part of the machinery was worn, defective, or had become loose, the trucks and wheels were thereby locked and could not take the curve, thereby causing them to jump the track, which almost overturned the car upon (which) your petitioner was riding and caused great personal injury to your petitioner, as aforesaid. He shows that this accident was caused without any contributory negligence on his part, but was due entirely to the negligence of the company in placing upon the track a car which was not safe for its employees to handle, but, to the contrary thereof, being so defective as to be dangerous for said employees. That said injury would not have happened to petitioner but for the defect in the mechanism of the car, as aforesaid." There are further allegations setting forth the sufferings of the petitioner, the amputation of his leg, the expenses incurred by him, and his impaired earning capacity, and a prayer for judgment in the sum of $25,313.00. The defendant denies the existence of the alleged defect in the car, denies that the injury of which petitioner complains was the result of any

fault or negligence on its part, and alleges that plaintiff contributed to, if he did not wholly cause, the accident by the negligent and unskillful manner in which he performed his duties as switchman. It further alleges that if the negligence of any other of its employes contributed to said accident, the defendant is not responsible therefor, either under the general law, or under the provisions of its legislative charter, being act No. 37 of 1877. And, finally, and in the alternative, that, if the accident was not contributed to by the negligence of the plaintiff and was not due to the negligence of a fellow servant, it was a risk assumed by the plaintiff, as incidental to his employment, for which the defendant is not liable. There was a verdict and judgment for the plaintiff in the sum of $12,500, from which defendant has appealed.

There are certain facts which are either admitted or established beyond controversy, to-wit:

The plaintiff was an active man, who, for about four years, had been employed by the defendant as brakeman at Morgan City. The defendant's main track, from New Orleans, approaches that station from the east. On the south side of this track, there are quite a number of other tracks, switches, and sidings that are used for the accommodation of the traffic carried on between the railroad and the steamship lines, and, among them, there are two parallel tracks, running along the front of the wharf, the one about seven feet in the rear of the other. These tracks are reached by what, in order to distinguish it, may be called the "main switch," which leaves the main track some distance farther back, and they are connected together by means of a switch which extends from one to the other in a short, reverse, curve. Using the accompanying rough sketch, for convenience of illustration. "A" may be supposed to represent the main track, "B" and "C" the two parallel tracks, "D" the connecting switch, "E" the point at which the accident occurred, "F" the wharf, and "G" the main switch.

Upon the morning of May 27, 1900, the plaintiff had coupled to the switch engine several cars, standing on the track "C," that were to be pulled out, through the switch "D," on to the track "B," and when the engine and forward car had passed, at the rate of three or four miles an hour, he ascended the ladder on the second car, which was an empty box car, in order to go on to the next switch, and had about reached the top of the car when the rear truck, instead of taking the turn into

Budge vs. Railroad and Steamship Company.

the switch, mounted the rail, or split the switch, and went off the track, causing the car to jolt and list toward the front of the wharf in such a way that the plaintiff was either thrown off, or, being apprehensive that the car was about to turn over, jumped off, with the result, that one of his legs was caught between the derailed truck and the outside rail of the track "C," and was so badly crushed that it subsequently became necessary to amputate it below the knee. The track is laid upon the level plank wharf and is shown to have been in perfect condition, and the engine, the forward car, and the forward truck of the car upon which the plaintiff was riding, had passed, in safety, over the point at which the rear truck was derailed. There was present, at the moment of the accident, besides the plaintiff, Joret, the yard master, and Blancon, a switchman; and Joret, shortly afterwards, replaced the car on the track. Being asked who assisted him, he answered, "Blancon was the only one, there might have been others around there, but I did not notice them." Blancon, on the other hand, testifies that the car was put back by "Mr. Joret, young Shinn and some of the other boys." And "young Shinn" testifies that the car had already been put back on the truck when he first saw it. No one who admits having participated in replacing the car on the track, except the yard master, has testified in the case. It is not disputed that it was the duty of the yard master to see that the property belonging to the defendant and the rolling stock in the yard at Morgan City were in good order. Being called to the stand on behalf of the defendant, this witness, early in his direct-examination, was asked what means he used in replacing the derailed car on the track, to which he replied, "I just jacked it up a little and used the frog." Later on, his attention was called to the question of the alleged immobility of the rear truck, resulting from the locking of the friction plates, which the plaintiff asserts was the cause of the accident, and he was asked whether he could have replaced the car on the track with the friction plates locked in such a manner as to immobilize the trucks, to which he replied, "No, sir, it would be a matter of impossibility to replace the car back on the track with the plates locked, unless you would put a *jack screw under it and jack it up first.*" He was then asked, "Did you use a jack screw in putting that car on the track? to which he answered, "No, sir, I never thought of a jack screw at the time. Q. What did you use to put it back on the track? A. I just used an iron bar, like the company

furnishes for that purpose." Still later, he was again asked, "How did you get this car back on the track?" and he replied, "I just run the frog there and pulled it back with the engine. He was asked, "Did you examine the trucks of the car before you put it back on the track?" He replied, "No, sir, the only thing that I done was to put it back on the track." Being asked, at another time, "Mr. Joret, after Budge was hurt, did you look at the car from which he fell or jumped?" He replied, "No, sir, I looked at it after it was put back on the track. Q. State whether or not the hanger pin was out of the socket before it was put back on the track? A. That I don't know." Being asked as to any subsequent examination, he testifies that he made no thorough examination of the car. Referring to a statement made by him that the hanger pin was out of its socket, he was asked, "Now Mr. Joret did you find any other cause for the jumping of the track, other than the defect you saw in this car? To which he answered, "No, sir."

In his report to the company, of even date with the accident, the witness says, "Accident was caused by rear truck of car splitting switch and taking wrong track, thus twisting car and causing it to lean over badly."

Blancon assisted in taking the injured plaintiff home and then returned to the scene of the accident before the car was replaced on the track. He was asked, by counsel for defendant, "Well sir, did you, at the time that the car was off the track, look around at the trucks?, and he answered "No, sir." He was recalled, late in the trial, and asked, by the same counsel, "Now can you state whether or not the hanger pin was out of that car before it was jerked back on the track?" And he answered, "I don't know." And yet, at other times, he says that he looked around the car "right after the accident," and that the hanger pin was then out of its socket, and that there was a nut missing from a bolt in the upper friction plate, but that the plates were in position, and that there was nothing otherwise the matter with the truck; that the truck was replaced on the track by Joret, Shinn, and some of the boys "with a rope," and that they had very little trouble and had to use but little force. This witness appears, subsequently, and after the car had been replaced on the track, to have made an examination in company with Chotin and Fields, though he testifies that he does not remember that Fields was present.

Callan, the road master, was at breakfast when the accident occurred, but went down a few minutes later and looked at the car, before it was replaced on the track. He testifies that he did not go under the car, as it was not necessary, but that he inspected it and found nothing wrong, no defects whatever. Being asked "Did you examine the hanger pin thoroughly?" he replied "Yes, sir, I saw the car and looked at it, I saw nothing wrong with it at all." Being asked, "Then, if a car was to jump the track, and you go there or examine the car and find a defect, you would conclude that the jumping of the track was what caused the defect?" he replied "Yes sir." "Q. Come to that conclusion at once? A. Yes sir." Q. You would not attribute the jumping of the track to any defect in the car? A. No, sir, that would be very hard to say."

Paul Chotin, who has been about thirty years in the defendant's employ as switchman and brakeman, testifies that about two hours after the accident, he, Blancon, and Fields, the latter being a conductor in the defendant's service, in the presence of the yard crew, examined the car, in order to find the cause of the derailment, and that he found; that the hanger pin was displaced; that one bolt, or, possibly, a nut from one bolt (the witnesses sometimes speaking of the one and sometimes of the other), was gone from the upper friction plate; that the nut on the other bolt was loose; and that the plate "was hanging by one bolt"; that the upper and lower plates were locked, so that the truck could not steer in taking the curve into the switch; and, hence, the accident. There is no doubt that Fields, as well as Chotin, at that time, reached the conclusion, and so expressed himself, that the defects which they observed had so immobilized the truck as to prevent it from taking the curve into the switch and that the derailment was the result. And Fields, being examined as a witness, admits that he made a statement to that effect, long afterwards, and testifies that, the hanger pin being out, the truck would not steer so as to take the curve, and that he had stated that he would not take a car in that condition out from a "terminal." Upon the other hand, he also testifies that the displacement of the hanger pin was the only defect that he noticed, and, being asked "Would, or would you not, consider a car with the hanger pin out in a fit condition to run and for the employees to work on?" He answers, "I could not say that I would consider it unsafe." It may be remarked, in this con-

nection, that just before, or pending, the trial, the witness, together with some of the officers of the road and some of the car inspectors, who had been summoned on behalf of the defendant, as experts, had re-examined the car in question (ten months after the accident), and the witness appears to have been convinced, in the course of a discussion on the subject, that the displacement of the hanger pin could not have caused the derailment.

Maitland is a bridge foreman and track repairer, who, the morning after the accident, replaced the hanger pin, under instructions from the yard master. It does not appear that he examined the car until after the yard master and his assistants had put it back on the track, and he then found no other defect than the displacement of the hanger pin. Upon that subject, he was asked, "Does the railroad company generally run cars with the hanger pins out of place?" To which he replied, "Most decidedly not, when we see them out of place we put them in on the first occasion."

A number of witnesses, so called experts, were examined on behalf of the defendant company for the purpose of showing that the displacement of the hanger pin is a matter of no consequence; that it is impossible for the friction plates to become locked so long as the truck remains on the track; and that the defects in the truck, in this particular case, were probably the results, rather than the cause, of the derailment. In order to appreciate these theories, and the testimony adduced in their support, it is necessary that one should know something of the construction of the truck and its relation to the car, a species of information which is not readily imparted in words. We shall endeavor, however, to be as intelligible as the conditions will permit. There are different kinds of trucks, but the truck in question consists of two pairs of wheels, each pair being connected by an iron axle, to which the wheels are immovably attached. The ends of the axles project, through the wheels, into an iron frame which extends, upon the outside, from a wheel of the one pair to a wheel, upon the same side, of the other pair, and is connected, between the two pair, from one side of the track to the other, the whole forming a figure something like the letter "H," with a pair of wheels, upon an axle, between each of the open ends. That part of the frame which extends across, and holds the sides together, consists of two pieces of iron called "transoms" (or sometimes called "channel bars"), probably ten or

twelve inches broad, set up edgewise, at a distance of, perhaps, a foot apart, which, being parallel to each other, form what may be called a bottomless channel, or trough, extending from one track to the other, between the front pair of wheels and the pair in the rear, the upper edges of the transoms being higher than the axles, so that, in the absence of other device, the body of the car would rest upon the transoms, but, as the entire frame is, practically, in one piece, and rigid, it is obvious that such an arrangement would produce the same effect as though the body of the car rested upon the axles, themselves. To obviate this, and to provide ease of motion for both the body of the car and the trucks, there is, in this trough, a "bolster," consisting of a plank, upon either end of which rests a spiral spring with a piece of timber on top of them, the whole being suspended in the trough by means of two slings, each of which consists of two iron straps, and two iron pins, called "hanger pins," the top pin running through the upper ends of the straps and, ordinarily, resting in raised sockets on the edges of the transoms, and the bottom pins running through the lower ends of the straps and affording the necessary support for the bolster. There may be some other supports for the bolster, across the bottom of the channel, or trough, but the main supports are the upper hanger pins. The bolster, as thus suspended, arises above the upper edges of the transoms, is perforated through the middle by the "king bolt" of the car, and has, upon the upper surface, towards either end, a "friction plate," which corresponds with a similar, but longer plate, attached to the under surface of the bottom of the car, the two together constituting the "side bearings," and serving, practically, as segments of a fifth wheel, whereby the body of the car is allowed a certain play, and, yet, is prevented from listing in such a way as to jam the "centre bearing," or throw too much lateral strain on the king bolt. The lower plate is a piece of iron about four inches square and two or three inches thick, whilst the upper plate is from fifteen to seventeen inches long, about three inches thick, and, probably (though there is no direct testimony on that subject), about as wide as the lower plate. This upper plate, as originally put on, is fastened to the car by two bolts, one at each end, coming through the bottom of the car and through the plate, with nuts on their lower ends, and "lips," or "lugs," on each side, to keep the plate from being twisted around.

It is undisputed that one of the upper hanger pins on the truck in

question was found, immediately after the accident, resting upon the transoms, two inches, or more, outside of its sockets, and that the car had thereby acquired a list of, perhaps, a couple of inches. It is also undisputed that the nut was missing from one of the bolts intended to hold the upper friction plate in position, and, we are inclined to think, from the testimony, that the bolt, itself, may have been missing, whilst Chotin, as we have seen, testifies that the nut on the other bolt was loose and that the plate was "hanging by one bolt."

Returning, now, to the experts; it appears, from their testimony, that, as a rule, they have had no experience whatever in running trains, or 'n handling moving cars. One has been a carpenter, another has played base ball, others have been car repairers, etc. And, from these different avocations, they have been assigned to duty as car inspectors, and, as car inspectors, have undertaken to testify as experts concerning the possible danger of derailment, and otherwise, to moving cars, resulting from different conditions, hypothetically stated. It would be unprofitable to recapitulate the testimony of these witnesses at length, or to spend much time in criticising it. They testified, generally, that the truck, whilst on a straight track, cannot turn far enough to allow the friction plates to become locked by getting the one behind the other, and that the listing of the car, resulting from the displacement of the hanger pin, cannot effect such a result and does not endanger the safety of the car. As to the first of these propositions, it may be said, that the car in question was not on a straight track, but that the rear truck was derailed when the forward truck had been carried into the switch, around a sharp curve, and because it, the rear truck, failing to follow, split the switch, and kept on the main track, so that, as the yard master reported, the car was twisted, and made to lean over badly. The truck might, therefore, very well have reached the angle, as compared with the body of the car, which the witnesses think was necessary to the locking of the plates. Aside from this, as the hanger pin is two inches in diameter and was two inches, or more, upon the outside of its sockets, the bolster must have been carried four inches, or more, out of its proper position, and, as the lower friction plate is bolted to the bolster, it may have happened, if the king bolt had been bent or broken by reason of the undue weight thrown upon it by the listing of the car, that the lower plate was taken more than its width from under the upper plate, and that the two plates locked sidewise.

As to the other proposition, the witnesses seem to us to have gone very far in their effort to establish it. Taking them together, they testify that it is perfectly safe to run a car "as long as the truck transoms are all right," that is to say, with the bolster out, which is equivalent to saying that a car can be run safely upon trucks which are as rigidly attached to its body as ten or fifteen tons of dead weight can attach them, and yet we do not understand it to be seriously denied that if a truck becomes locked, and rigid, it is thereby rendered incapable of accommodating itself to curves, and will go off the track, either by splitting a switch, or by mounting a rail. They testify that a car is no more liable to be derailed by being listed than if evenly balanced. The evidence shows that the car in question was taken to Morgan City, the day before the accident, weighing 52,000 pounds, of which, one-half, or about twelve tons, was freight. If it was listed to one side a greater proportion of this weight than was contemplated in the building of the car was thrown, laterally, on the king bolt, which is about two feet long and about two inches in diameter, and to that weight was added the force resulting from the movement of the car, where the track was uneven, or where it curved. It seems to us that, starting in such a condition, the bending or breaking, of the king bolt would only be a matter of time. One witness says that it might be safe to run such a car at the rate of twenty miles an hour, but, possibly, not safe, at the rate of twenty-five miles; another, that it would be safe to go a short distance, say one or two hundred miles; another, that he would be willing to risk it for thousands of miles; another tells us that a car will not be derailed with all the hanger pins, and the king bolt, out; another, who states that he never heard of the "fifth wheel" of a buggy, testifies that if a car came in "without any nuts or bolts," or with the hanger pin out of its sockets, he would have it repaired "if they had time," otherwise he would let it go on, that, in inspecting cars, he pays particular attention "to the wheels, the top axle, and the arch bars," and, in answer to a question as to the hanger pins, answers, "Yes sir, to the top hanger pin," and yet the bolster will drop out as certainly in the absence of the bottom pin as of the top one. Another inspector says that if a car came in with the hanger pin out he would have it repaired if it contained *perishable freight,* we do not, however, understand him to refer to human beings. Without going any farther, it is sufficient to say, that, whilst these witnesses

have, perhaps, testified according to their lights, there seems to us to be no reason why they should be heard as experts with respect to the matters concerning which they were interrogated, and we are not otherwise impressed with their views. A man may spend his life in hammering rivets in iron bridges, or in inspecting them, without becoming an expert in the matter of the strain imposed upon a bridge by the marching of a body of troops, or by a hurricane blowing at the rate of eighty miles an hour; and so, a man may spend his life doing the work of a cabinet maker, in a car shop, or in inspecting cars to see whether the different parts are sound and in their proper positions, without finding out how much lateral pressure is thrown on the king bolt of a freight car, carrying twelve tons of freight, when the car, listed two inches, and in running at the rate of 25 miles an hour, strikes a block of wood, or a stone, on the track, or runs into a curve, or, the track being uneven, rocks from side to side.

These remarks do not apply to the engineer of the road nor, perhaps, to one or two others, whose practical experience may, in some degree, have qualified them to testify as they did, but the hypothetical testimony of these witnesses cannot control the facts of the case.

No witness, except Callan, the road master, and Blancon, the switchman, pretends to have examined the car in question whilst it was off the track, and Callan swears that the derailed truck was then all right, including the hanger pin, which we know was not all right. Blancon, though at one time stating that he made an examination, right after the accident, at other times, specifically and categorically, swears that he did not examine the car until after it had been put back on the track. No one who assisted in replacing the car on the track, except the yard master, has testified in the case; and the yard master, whose duty it is to see that the cars in the yard at Morgan City are in good order, and who was by the side of the car in question when it was derailed, tells us that he replaced it on the track without looking at the derailed truck (though he saw, in some way, that the hanger pin was out of its sockets), and that he never, thereafter, made a thorough examination of the car. He also tells us, in the beginning of his testimony, that he used a jack screw in the replacement of the derailed car; but, later on, in connection with the statement that if the truck had been locked he would not have been able to replace it without the use of a jack screw, he denies that he used a jack screw, and says that he used only an iron bar; and, later still, he says that he

used some other appliance. He also tells us that Blancon, alone, assisted him in replacing the car, though there were some others around whom he did not particularly notice, but Blancon testifies that Shinn and the train crew rendered the assistance, whilst Shinn swears that he did not see the car until after it was replaced; and the train crew have not been heard from. We are therefore absolutely without reliable information from any one, who is willing to admit that he examined it, as to the condition of the car between the time that it was derailed and the time that it was found replaced on the track. And this seems to us to require explanation. Here was a little train, consisting of an engine and four cars, in charge of Joret, the yard master, two brakemen, Budge and Blancon, and, presumably, an engineer and a fireman. A truck was derailed and Budge was crippled for life. Joret, the yard master, knew that it was his duty to replace the derailed car on the track, and to find out, and to report to the company, the cause of the derailment. The witnesses all say that there was nothing the matter with the track. It seems to us, under these circumstances, that, in the discharge of his duty, Joret would naturally have examined the car before replacing it on the track, for the double purpose of ascertaining the cause of the accident and of finding out whether there was any defect in the car which would prevent its being replaced.

It seems to us, also, that Blancon, and the yard crew, and the engineer and the fireman, would, naturally, as a matter of interest, or curiosity, have examined the car before putting it again on the track, from which it had just, apparently, derailed itself, without cause, in order to solve the mystery and protect themselves and the company from another, and perhaps even more disastrous, derailment. But Blancon specifically denies that he examined it until after it had been replaced, although he was on the spot, and neither the engineer, the fireman, nor the yard crew were examined. Taking it all together, it looks somewhat as though Joret and Blancon were afraid that if they examined the car they might acquire some information that they did not care to possess, and we are left to conjecture as to whether such information was not acquired by the engineer, the fireman and the yard crew. Joret was, however, obliged to make his report, and he therein states that the rear truck split the switch; and, as he testifies that the track was in good order, and it appears that the several trucks which had immediately preceded that which was derailed had not split the

switch it would seem to follow that the derailed truck must have differed in some way from the others, and it seems to us not unlikely that the difference which caused one truck to split the switch when the others did not was, that the one was, for some reason, immobile and held on to the straight track, whilst the others took the curve, and it may be that this immobility was so far cured in replacing the truck on the track as to make it comparatively safe, for those who were afraid of acquiring too much information thereafter to inspect it, though not thoroughly, as we understand the yard master to say that he never did inspect it thoroughly. Chotin, Fields, and Blancon, however, gave the car a pretty careful inspection soon after it was replaced on the track. Chotin had been engaged in handling moving cars, as a brakesman and switchman, for about thirty years; Fields had been a brakeman and conductor for about eleven years, and Blancon is a switchman. These witnesses, we think, might fairly lay claim to expert knowledge in the matter of the causes that would be likely to derail a car, and they were about as well qualified to judge, upon looking at the particular car in question, which had just been derailed and rerailed, of the cause of the derailment as any one else would be likely to be. Chotin and Fields were of the opinion that the cause was the immobility of the truck, and, though Blancon is not shown to have committed himself, it does not appear that he, at that time, put in any protest against the conclusion reached by the others. When Fields was examined as a witness for the plaintiff he was asked, "State whether or not, the hanger pin being out of place, the trucks would slew so as to take the "curve," and he answered, "No, sir, not in my judgment." He was asked, "If the saddle bolster that you call the 'Ink,' marked 'B,' if that is lowered down, or drops down, is it not a fact that the trucks become rigid, so that they would not take the curve," and he answered "Yes sir, if they drop down that far the trucks would become rigid and the car would not take a curve." He was asked, "Well, the track being in order and the truck leaving the track, the natural conclusion is that the accident was caused by some defect in the truck?" and he replied, "Well, if the track was in order the cause must have been in the truck." Later in the trial, he was examined as a witness for the defendant, after having discussed the question at issue with the car inspectors, who were examined as experts, and with some of the officers of the road, and he seems, to some extent, to have gone over to their way of thinking. In our

opinion, the testimony given by him on his first examination was the more intelligent, and, after considering the circumstances and probabilities of the case, in connection with all the testimony, our conclusion is that the derailment of the car was caused by the displacement of the hanger pin and the loosening of the upper friction plate, resulting in the locking of the truck to such an extent as to prevent its taking the curve into the switch; and this is what the plaintiff has alleged.

It is not enough, however, for an employee to show that he has been injured by reason of a defect in the appliance with which he has been furnished by the master, since the liability of the master in such a case arises, not from the fact of the injury, nor from the defect in the appliance, but from some omission of duty on his part in the matter of the selection of the appliance or of its mainteance. From the general jurisprudence on this subject, we are of opinion that the rules applicable to the facts in this case that are best sustained by reason and authority may be stated as follows:

Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences, not of danger, but, of negligence, and negligence, in such cases as the one now under consideration, consists of the failure of the employer to exercise due care that appliances furnished for the use of its employees shall be safe, when furnished, and shall be maintained in a safe condition. Whatever may be the duty of the master as to the methods to be adopted for ascertaining whether the appliances so furnished are suitable and safe, due care requires him, especially in the use of dangerous appliances, or where the service in which they are used is dangerous, either by himself or by some other selected for that purpose, in either case, one competent and qualified, to inspect and look after the condition of such appliances and see that they are kept in repair. This duty is personal to the master and must be continuously performed by him, or by those whom he selects to represent him, and he is liable for its neglect, whether by his representatives, or by himself, the danger resulting therefrom not being assumed by his employees as incidental to their employment. In the matter of foreign cars, we approve the rule as thus stated by the court of appeals of New York, to-wit: "A railroad company, drawing the cars of another company over its road, owes a duty to its employees in reference thereto. It is bound to inspect such cars, the same as its own, and is responsible for the consequences of such defects as would

have been disclosed by ordinary inspection, as it is its duty either to remedy them, or to refuse to take the cars. The employee no more assumes the risks of such defects than of those in cars belonging to his employer." Gottliem vs. R. R. Co., 100 N. Y. 462. See, also, as sustaining, generally, the propositions above stated, Bailey's "Masters Liability for Injury to Servants," 14, 24, 95, 101, 106; Thomas' "Negligence, Rules, Decisions, Opinions," 743-749, 752, 753, 754, 756; Black's "Law and Practice in Accident Cases," 73, 74; "Wharton on Negligence," 210, 212; Northern R. R. Co. vs. Herbert, 116 U. S. 642; Dewey vs. R. R. Co., 97 Mich. 329; Cowan vs. R. R. Co., 80 Wis. 284; Morton vs. R. R. Co., 83 Mich. 433; Ill. Cent. R. R. Co. vs. Phillips, 49 Ill. 237; Bomar vs. R. R. Co., 42 Ann. 983; Ferris vs. Hernsheim, 51 Ann. 178; Tutrix vs. Sellers, 39 Ann. 1011; Meyers vs. R. R. Co., 49 Ann. 21; Town vs. R. R. Co., 37 Ann. 630; Van Amburg vs. R. R. Co. 37 Ann. 650; Anderson vs. Elder Dempster Co., 105 La. 672.

The charge that the plaintiff was guilty of contributory negligence is disproved and we dismiss it from further consideration. The question which remains to be determined is, has the negligence of the defendant upon the basis of which the plaintiff must recover, if he is entitled to recover at all, been established? And, as a preliminary to the decision of this question, it ought to be determined whether the circumstances of the accident, itself, make out a *prima facie* case of negligence, such as to require an explanation from the defendant, or whether, in the absence of explanation, further affirmative proof should be required from the plaintiff. "The fact of the happening of the accident has no tendency to prove negligence, for the very good reason, if no other, that the negligence, or the facts from which it is to be inferred, must be affirmatively proved. "Bailey's Master's Liability for Injury to Servants," 508. There are, however, many cases, from the facts or circumstances of which negligence may be inferred. Thus, without going into unnecessary detail for the purposes of illustration, it has been held by the Supreme Court of the United States that, "When a steamboat, on a calm day, in smooth water, is thrown, with such violence against a wharf, properly built, as to tear up some of the planks of the flooring, this, if unexplained, is *prima facie* evidence of negligence on the part of her agents in making the landing." Island & Seabord Coasting Co. vs. Tolson, 139 U. S. 551. And so, if it appeared that a trestle on a railroad had given way under a train and that the timbers of which

it was built were, obviously, rotten, a presumption of negligence in the matter of inspection and maintenance would arise.

In the instant case, we are not disposed to hold that any presumption of negligence arises from the mere fact that the car in question reached Morgan City with the hanger pin out of its sockets and one nut gone and the other loose on the bolts of the upper friction plate, since that condition might have resulted from the movement of the car during the trip, of a few hours, from New Orleans. A somewhat more doubtful question presents itself in the matter of the failure of the yard master to inspect the car upon its arrival, it appearing from the evidence that it reached Morgan City at about mid-day on May 26th and that it had not been inspected up to the time of the accident, say seven o'clock on the following morning, and it further appearing from the evidence that the regulations of the defendant require that cars shall be inspected upon arrival and departure. We are inclined to think that a regulation of this kind presupposes a necessity for it. And if the company considers it necessary and proper that a car should be inspected upon its arrival in, as well as upon its departure from, a yard, we find no reason for adopting a different view, the more especially as, in this case, we believe that a compliance with the regulation would have saved the plaintiff his leg. Our investigation and study of the case has, however, led us to doubt whether the car was inspected before leaving New Orleans, and has convinced us that, if inspected, the inspection was insufficient. The evidence shows that it was inspected by the defendant's chief car inspector, at New Orleans, upon May 17th, and that he found that it then needed a "brake head, shoe, bolt and key," which, he says, were supplied, after which the car was sent out West. The witness, also, and among other things, says, in substance; that, if a nut is off of one of the bolts that hold the upper friction plate, and the hanger pin is out of its sockets, resting on the transoms, it can have no effect, whatever, on the running of the car or the locking of the wheels; that, if the hanger pin is entirely gone the bolster will not drop far enough to cause the truck to lock, so long as it remains on the track; that, as a matter of fact, at the time of his inspection, May 17th, the hanger pin was in its place, but that there was a nut missing from one of the friction plate bolts, and, as we understand him, he paid no attention to the missing nut, and would, in all probability, have paid no attention to the hanger pin had it been out of

its sockets. It may be remarked, in connection with this testimony, that, although upon the occasion of the inspection to which he refers, he had received the car from the Louisville & Nashville road, and although he found that it then needed a "brake head, shoe, bolt and key," the inspector of the L. & N. road, who delivered it to him, upon May 15th, testifying as a witness for defendant, says, that when he delivered the car, it "was in good order the best kind of order," which would seem to indicate that even the inspectors have different standards of excellence in such matters. It may not be amiss, also to say that the witness last mentioned testifies that he inspected 150 other cars upon the same day that he inspected the car in question, and that he is able to state, positively, that no bolts or nuts were missing on that particular car and that nothing was wrong about it because he kept a record of the defects, and the defects only, in the cars inspected by him, and that he had no such record of C. P. car No. 25,021. This witness also testifies that if the hanger pin is gone the bolster will drop down to the track. Another car inspector, in the employ of the defendant at New Orleans, testifies that he inspected C. P. car No. 25,021 a number of times, both before and after the accident, and is particularly specific as to his inspection upon May 26th, 1900, the day before the accident, when the car left New Orleans for Morgan City. It turned out, however, that he had no recollection whatever of the car or of the inspection of which he testified, and that he gave his testimony from a type-written paper which purported to have been prepared by some one else as showing the contents of records kept by him, or his subordinates in New Orleans, and, being asked, finally, "On the 26th of May, who examined this car, you or your men?" he replied, "I could not say." If, therefore, the car was inspected before it left New Orleans, on May 26th, it is not so stated by any witness who had personal knowledge of the fact.

Upon the other hand, it is not shown that it was *not* inspected, and as the negligence for which the defendant is liable, if liable at all, must have consisted, either of a failure to inspect, an inefficient inspection, or a failure to make repairs called for by the inspection, as made, it is contended that the failure of the defendant to discharge its duty, in one or the other of these respects, must be shown by the plaintiff, by affirmative evidence, as a condition precedent to his recovery. We find it unnecessary to decide the question thus presented, and will only

remark here that whilst it is no doubt true that the negligence of the master in employing or retaining an incompetent servant, through whose fault a fellow-servant is injured, must be brought home to the master by affirmative testimony, it is not improbable that a distinction might be drawn where the negligence relates to inanimate and unintelligent agencies, and that, in the latter case, where it is shown that the agencies are defective, it might not be unreasonable to hold that the master should show that he used due care in their selection and in their subsequent inspection and maintenance. In this case, however, the defendant undertook of its own accord, to show that the car in question had been inspected, and, in the effort to do so, which, as we have seen, was unsuccessful, developed, as we think, the information that the inspection, if made at all, was made by persons who do not properly appreciate the responsibility resting upon them, and do not properly discharge the work for which they are employed. The defendant's inspectors, as well as the others who have been called as experts, agree, substantially, in testifying, that the fact that a hanger pin upon a car, loaded or unloaded, is two inches, or more, out of its sockets and is resting on the transoms, that the car is listed to one side, from one to three inches, and that a nut is missing from an upper friction plate, on the same side, is a matter of little or no consequence; and that, unless they had plenty of time and the car was starting out from a "terminal," or, as one of them states, unless it was loaded with *perishable freight,* they would not have the hanger pin replaced in its sockets, and, if we are to judge from the admitted fact in this case, they would not have the missing nut supplied under any circumstances. We take it, however, that the railroad companies have no desire to subject their employees to unnecessary risks, or, upon the other hand, to waste money by encumbering their cars with useless contrivances, which would add nothing either to their safety or their carrying capacity. We assume, not only because thousands of human lives are at stake, but also because of the enormous material interests which are involved, that the best talent is employed to design and construct cars, which, being the safest and most serviceable, shall cost the least money. If, therefore, a freight car would run as safely and as well with the hanger pins, by which the bolsters are suspended, resting upon the transoms, instead of in their sockets, there would be no money spent on the sockets; and if it would be useless and unnecessary to

secure, by means of nuts, the bolts by which the friction plates are held in position, the money expended for nuts and the labor expended in cutting threads for the bolts and screwing the nuts on would be used in the payment of dividends, or for some other purposes. And, hence, when an unscientific man, a laborer, employed to inspect a car and to see that everything belonging to it is in its proper position, and is sound and safe, undertakes to decide that an appurtenance for which scientific knowledge has provided a particular place will discharge its function as well somewhere else, or that it may be dispensed with altogether, he places himself in antagonism to the position to which his employer, with greater knowledge and greater interest, is already committed. Applying these general principles to the facts of the instant case, whilst we can understand that a freight car, with a hanger pin out of its sockets and listed on one side, and with a nut missing from a friction plate bolt, may be hauled from one place to another without immediate disaster, we are satisfied that such a car would be in a safer condition with the hanger pin in its sockets and the nut on the bolt. And we are equally satisfied that the inspectors, themselves, are aware of that fact, and that their theory is, not that there is no additional risk, but that the additional risk, resulting from a misplaced hanger pin or a missing nut, or bolt, is one to which a train crew may be subjected. Nevertheless, one of them has testified that if a car in such a condition were loaded with "perishable freight" he would have it repaired, because another company might not receive it, from which we deduce that, however small the additional risk may be, it is not one to which fruit and vegetables should be subjected, though in the opinion of the inspectors, the human beings composing the train crew are not entitled to the same consideration. Our conclusion, then, upon the whole case, is that it was the duty of the defendant to have had the car in question inspected in New Orleans; that that duty, if discharged at all, was not efficiently discharged; that the condition of the car when it reached Morgan City was defective; that the defects were attributable to the defendant's failure to make proper inspection and repairs in New Orleans; and that those defects caused the accident which resulted in the injuries of which the plaintiff complains. The amount allowed by the jury is in excess of what has been allowed by this court in similar cases. Stucke vs. R. Co., 50 Ann. 172;

Conway vs. R. Co., 51 Ann. 146; Bell vs. Globe Lumber Co. (not yet reported).

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended by reducing the amount thereof to $6,000, and, as amended, affirmed, the plaintiff to pay the costs of the appeal and the defendant those of the district court.

## On Application for Rehearing.

Monroe, J. In their application for rehearing, counsel for defendant attempt to place the court in the attitude of having accepted as proven by the testimony of Chotin that the side bearings were locked, when he examined the car, after it had been replaced on the tracks, and they say: "Apart from direct contradiction by Joret, Blancon, Maitland, Fields and Callan, Chotin's statement is branded as absurd and false by the admitted impossibility of the cars standing on the rails on a straight track, where he pretends he saw it, with the side bearings locked by the top plate swinging down against the lower one. * * * How the court could have failed to realize that, beyond the question of the condition of the car when derailed there was still the question of its condition after being put on the track, is surprising enough, but that the court should have paid no attention to this physical rebuttal of Chotin is astounding."

There is nothing in the opinion to sustain this attempt or to occasion the astonishment thus expressed. It is true that, referring, in general terms, to the testimony given by the different witnesses, the opinion mentions the fact that Chotin testified that the plates were locked, when he examined the car; but that particular statement was not made the basis of the judgment, nor is it so intimated. And, possibly, an injustice was done to the witness in not giving his testimony more fully, since it appears doubtful whether he intended to convey the idea that the plates were locked when he examined the car, or merely that, from the condition as he then found it, he concluded that they had become locked when the car entered the curve. Thus, the following was elicited from his cross-examination:

"Q. And you found these plates locked?

"A. Yes, sir.

"Q. And one of the bolts missing out of that top plate?

"A. One of the nuts was off and the other was loose.

"Q. Did you examine the lower plate?

"A. Yes, sir; that was resting on the side bearings.

"Q. Now, how would that interfere?

"A. Well, the top plate was bearing on the side rests.

"Q. Well, how would that affect it?

"A. It would allow it to steer one way, but not the other.

"Q. Now I will place these two books one on top of the other; we will call the top book the top plate, and the lower book the lower plate. Now this top plate had a bolt, as you say, of only one inch. Can you explain how that would effect the curving of the car; in what way would it cause those two plates to lock?

"A. (Witness here explains to the jury.) The bolt was loose on one side of the top friction plate, and on the other side it was gone; and, the hanger pin being out, the car was lower and listed to one side; that would cause one of the plates to work to one side and be higher than the other, and in going into a curve it would be locked and could not come back to its place, and that would keep the trucks from steering, and they would go straight on."

The facts to which he testified, therefore, were that one of the bolts in the upper plate was missing, and the other loose; that the hanger pin was out of position; that the car was listed to one side, and that the "top plate was bearing on the side rests," from which he appears to have deduced, rather as an opinion than a fact, that the plates had become locked, when the car entered the curve. And Fields, who examined the car at the same time, and corroborates Chotin as to the misplacement of the hanger pin, reached the same conclusion as to the effect of that condition, as may be seen from the following questions and answers in his examination as a witness for the plaintiff:

"Q. State whether or not, the hanger pin being out of place, the trucks would slew so as to take a curve?

"A. No sir, not in my judgment. * * *

"Q. When the hanger pin works out of its socket and the car drops down, is it not a fact that that would cause the trucks to become rigid?

"A. Yes sir."

This being the case, and the witness, Chotin, being a plain working man, with a limited vocabulary, it is hardly justifiable, upon a doubtful interpretation of his meaning, to make the charge that his statement "is branded as absurd and false," and it is not a legitimate method of

arguing for the counsel to profess to be astonished that this court should have accepted that statement, so interpreted, as full proof, when, in point of fact, it was not, and the opinion handed down affords no reason for supposing that it had been so accepted.

The counsel say in their brief: "It is a misstatement of the facts to say that the car reached Morgan City in a defective condition. With absolutely no basis for such a statement, why depend on the record at all, if essential facts are to be bodily supplied *ex cathedra*? We say that the court has supplied this fact, without any intention of suggesting that the court would knowingly make a misstatement, for we know that the court would do nothing of the kind," etc.   The expression in the opinion to which this charge is directed reads as follows: "Our conclusion, then, upon the whole case, is that it was the duty of the defendant to have had the car in question inspected in New Orleans; that that duty, if discharged at all, was not efficiently discharged; that the condition of the car when it reached Morgan City was defective; that the defect was attributable to the defendant's neglect to make proper inspection and repairs in New Orleans."   * * *

This conclusion was reached and expressed after as careful a consideration and review as we were able to give, and to make, of all the undisputed facts and of all the testimony in the case.   It was a conclusion of fact, predicated upon the facts, which we believed to have been established, that the car, if inspected at all, was not efficiently inspected in New Orleans; that, nothing having happened to it which could account for its defects, so far as shown or suggested, during the interval which elapsed between its arrival at Morgan City and the moment of the accident, when the rear truck ran off a track, which was in perfect order and free from obstructions and over which other cars in the same, slowly moving train, and the forward truck of the particular car in question, had passed in safety; and that, immediately thereafter, defects were discovered in the truck, which, in our opinion, were sufficient, in the absence of suggestion of any other known cause, to account for the derailment.   And this, we take it, was the opinion of the jury, which gave a verdict for the plaintiff in the sum of $12,500, and of the judge before whom the case was tried and who made that verdict the judgment of the court.

The counsel say: "To eke out Chotin's story, that, after the accident, the side bearings were locked, the court presumes that they were locked

before the accident, and it reaches this conclusion by supposing that the king pin was bent on the trip to Morgan City in consequence of the hanger pin being out; and that the hanger pin was out before the accident is likewise presumed."

The charge that the court indulged in any presumption in order to "eke out Chotin's story" has no foundation in fact, and the assertion that the court reached the conclusion that the plates were locked before the accident by supposing that the king pin was bent on the trip to Morgan City is equally unwarranted. As may be seen by reference to the opinion, it was said, referring to the testimony of certain witnesses for the defendant who undertook to testify as experts: " They testified, generally, that the truck, while on a straight track, cannot turn far enough to allow the friction plates to become locked by getting the one behind the other, and that the listing of the car, resulting from the displacement of the hanger pin, cannot effect such a result and does not endanger the safety of the car. As to the first of these propositions, it may be said that the car was not on a straight track, but that the rear truck was derailed when the forward truck had been carried into the switch, around a sharp curve, and because the rear truck, failing to follow, split the switch and kept on the main track, so that the yard master reported, the car was twisted and made to lean over badly. The truck might, therefore, very well have reached the angle, as compared with the body of the car, which the witnesses think was necessary to the locking of the plates." And the theory is then propounded that the plates might have become locked sidewise by reason of the listing of the car, and the bending of the king bolt. It may be conceded that this latter theory is improbable and, perhaps, wholly unsound, and that, in all probability, the plates could not have become locked in the manner suggested; but that has nothing to do with the present question. There were two ways suggested by which the plates might have become locked; the one, as we believe, a practicable and probable way; the other (as we now think) an improbable one, suggested and considered as a possibility, and the counsel have seen fit to ignore the former and to say that the court reached its conclusion, or presumption, upon the basis of the latter, alone; and, in doing so, they make use of the following language: "It is remarkable how little this case depends on fact. The issues have been settled by pure mental effort, with an occasional reference to the record. We trust this criticism of the opin-

ion is proper; it may serve to direct the attention of the court to the general defect in the opinion without which the case would certainly have been decided differently. The objectionable presumption to which we refer is that the court, finding that there could be no locking of the side bearings, without discovering somewhere a play of at least four inches, out of the normal between the upper and lower plates, carves the four inches out of the impossible."

There was, however, one fact commented on, with some emphasis, in the opinion, of which this application for rehearing offers no explanation. It is referred to in the following language: "We are, therefore, absolutely without reliable information, from any one who is willing to admit that he examined it, as to the condition of the car between the time that it was derailed and the time that it was replaced on the track. And this seems to us to require some explanation. Here was a little train, consisting of an engine and four cars, in charge of Joret, the yard master; two brakemen, Budge and Blancon; and, presumably, an engineer and a fireman. A truck was derailed and Budge crippled for life. Joret, the yard master, knew that it was his duty to replace the derailed car on the track, and to find out and report to the company the cause of the derailment. The witnesses all say that there was nothing the matter with the track. It seems to us, under the circumstances, that, in the discharge of his duty, Joret would, naturally, have examined the car before replacing it on the track, for the double purpose of ascertaining the cause of the accident and of finding out whether there was any defect in the car which would prevent its being replaced. It seems to us, also that Blancon, and the yard crew, and the engineer, and the fireman, would naturally, as a matter of interest or curiosity, have examined the car before putting it again on the track from which it had just, apparently, derailed itself without cause, in order to solve the mystery and protect themselves and the company from another, and perhaps even more disastrous derailment. Taking it altogether, it looks somewhat as though Joret and Blancon were afraid that if they examined the car they might acquire some information that they did not care to possess. And we are left to conjecture as to whether such information was not acquired by the engineer, the fireman, and the yard crew. Joret was, however, obliged to make his report, and he therein states that the rear truck split the switch; and, as he testifies that the track was in good order, and

that the several trucks which had immediately preceded that which was derailed had not split the switch, it would seem to follow that the derailed truck must have differed in some way from the others, and it appears to us not unlikely that the difference, which caused one truck to split the switch when the others did not, was that the one was, for some reason, immobile, and held on to the main track, whilst the others took the curve, and it may be that the immobility was so cured in replacing the truck on the track as to make it comparatively safe for those who were afraid of acquiring too much information thereafter to inspect it, though not thoroughly, as we understand the yard master to say that he never did inspect it thoroughly."

Referring to some of the language used in the foregoing excerpt, the counsel for the defendant say: "We are appalled at such a declaration as this from the court. We cannot refrain from saying that this seems to evidence quite a strong feeling on the part of the court against these particular witnesses, or against this particular defense."

The only explanation which they offer, however, is that in their opinion the witnesses *intended* to testify that they examined the car immediately after the accident. And this explanation would seem to require another which is not offered; *i. e.*, if the witnesses intended to testify " that they examined the car," etc., why, in point of fact, did they testify that they did *not* examine it, and that they could, therefore, give no information as to its condition immediately after the accident?

Referring to that part of the opinion in which it is said, "A somewhat more doubtful question presents itself in the matter of the failure of the yard master to inspect the car upon its arrival. It appeared from the evidence that it arrived at Morgan City at about midday on May 26th, and that it had not been inspected up to the time of the accident, say 7 o'clock on the following morning, and it further appeared from the evidence that the regulations of the defendant require that cars shall be inspected upon arrival and departure. We are inclined to think that a regulation of this kind presupposes a necessity for it," the counsel for the defendant say: "Such a regulation has never been promulgated; it was never spoken of at the trial; it has never been heard of at Morgan City; and simply has no existence. We are entitled upon so vital a point to a correction." C. Hantle, a witness sworn for the defendant, testified that he was the defendant's inspector at New

Orleans, and had been so employed for several years. His cross-examination reads, in part, as follows:

"Q. Do you inspect cars that just go from Algiers to New Orleans, across the river on the ferry?

"A. We inspect them every opportunity we get.  *  *  *

"Q. Is that the rule of the company?

"A. That is my rule.

"Q. Is that the rule of your company? Answer my question.

"A. Yes sir; to inspect them every time they go out or come in."

It is possible that the witness was referring to a rule which obtains at New Orleans and not elsewhere, but he does not so state, and we can conceive of no reason why such a rule should not be equally necessary at Morgan City, a point at which the railroad and steamship lines of the defendant meet in the transaction of a business which extends across the continent and far into the interior.

The counsel say: "The only inspectors for whose competency the defendant was responsible were Hayes and Hantle, and, after quoting certain of the testimony given by those witnesses and by one Garrett, they further say: "We would respectfully suggest that, in its general hostility against the hypothetical testimony of the numerous inspectors, the court allowed itself to believe that the inspectors at Algiers would have let the car pass, if defective, *without examining their testimony upon that point*. We venture the assertion that this testimony of Hayes, Hantle and Garrett will be quite surprising to the court." The counsel have ventured an assertion which is totally erroneous. The testimony referred to was carefully considered before the opinion was prepared. It is true that the witnesses mentioned give such testimony as the following—by Hayes:

"Q. Would you consider a car perfectly safe with the hanger pin out?

"A. Well, if it was at a terminal, I would have put it back in place; if not, I would have it go on."

But they also testify that there is no danger whatever in running a car with the hanger pin out of its sockets; from which, and from the testimony of other inspectors examined on behalf of the defendant, we concluded that they attached no importance to a defect of that kind and would have had it remedied at a terminal, though not elsewhere, only if it happened to be entirely convenient.

In this same connection, the brief of defendant's counsel contains the following:

"There was certainly no lack of frankness in the opinion dealing with the opinions of the inspectors; they were dismissed as of no weight or bearing; but the court did not refrain from parrying their testimony, saying they referred solely to the locking of the trucks on a straight track, while the accident happened on a curve. It is only natural that, having announced that such testimony would not influence the court, there should be inaccuracy in stating what it was, when the court did undertake to deal with it. Hence, error in the statement that this testimony did not take in the case of locking at the curve is not surprising. It will be found that locking at a curve is pronounced utterly impossible by Pollock * * * Fravor, * * * Gillan, * * * Ernst, * * * Cash, * * * McDonald, * * * Hayes."

The opinions of the witnesses named were disregarded either because, as appeared from their own statements, the witnesses were utterly without the experience or qualifications necessary to entitle their opinions to consideration, or because of the intrinsic weakness of the testimony, or for both causes.

In conclusion, it may be said that this court is restrained by the obligations, which are inseparable from the advantages, of its position, from attacking the motives and conduct of counsel engaged in the discharge of the duties which they owe to their respective clients, and it is, no doubt, partly for this reason, as well as because of other and obvious considerations of justice and propriety, that such attacks are rarely levelled at the court, though, in the discharge of its duties, the court is, necessarily, brought into close relations with the entire bar, and at one time or another must inflict disappointment upon each individual member. The brief under consideration is exceptional in this respect, and contains charges which are equally unfounded and unprovoked, and which cannot be reconciled with the professions of respect by which they are accompanied.

The application for rehearing is denied.